James C. RAY and Ronald Craiger, Plaintiffs-Appellants,

v.

Mitchell YOUNG, et al., Defendants-Appellees.

No. 84–4155.

United States Court of Appeals, Fifth Circuit.

Feb. 20, 1985.

**388**

Douglas L. Hebert, Jr., Hebert & Demoruelle, Kinder, La., McClain, Morgan & Savoy, Lake Charles, La., for plaintiffs-appellants.

C. Thomas Tolbert, Sulphur, La., Jacques, Rester & Townsend, Robert T. Jacques, Jr., Daniel K. Rester, Hunt, Godwin, Painter & Roddy, Lake Charles, La., for defendants-appellees.

Before GARZA, RANDALL, and TATE, Circuit Judges.

GARZA, Circuit Judge.

James Ray and Ronald Craiger (appellants), members in good standing of Local 106, United Association of Plumbers & Steamfitters, instituted this action, alleging that Mitchell Young (appellee) breached the duty imposed on him as a union officer by Section 501 of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 501. After protracted proceedings, the appellants now appeal from a decision of the United States District Court for the Western District of Louisiana, which accords them only a portion of the relief they are seeking. For the reasons stated below, we affirm the decision of the court below with one modification as to relief.

## I.

■ The precise scope and nature of the duty imposed on union officers by Section 501(a) is not obvious on the face of the statute.[1] The case law often refers to the duty imposed as that of a fiduciary, but the statutory admonition to "tak[e] into account the special problems and functions of a labor organization" counsels against the blind adoption of trust principles from other contexts. With that principle in mind, we shall proceed to consider the appropriate scope of Section 501, a question of first impression in this circuit.

## A.

■ Section 501 was adopted primarily to address the problem of corrupt management of funds by union officials; this fact is apparent from the historical context of its passage. 1 *The Developing Labor Law* 49–54, 57–60 (C. Morris 2d ed. 1983). Therefore, Section 501 must be given its strongest reading in a case involving a union officer's diversion of union funds or property into his own hands.

Precisely that view was taken by the Second Circuit in its thoughtful opinion in *Morrissey v. Curran*, 650 F.2d 1267 (2d Cir.1981). In *Morrissey*, the court concluded that when a union officer personally benefits from a union expenditure, that expenditure will not be immune from judicial scrutiny by virtue of the mere fact that the union membership has given its authorization. A court is to look beyond the authorization to the reasonableness of the expenditure itself; any expenditure found to be "manifestly unreasonable" will be recoverable in a Section 501 suit.

■ The result in *Morrissey* is entirely consistent with the dictates of common sense. If authorization were an absolute bar to a Section 501 claim, a dominant union leader could readily thwart the policies behind the Act. Accordingly, we hold that where a Section 501 plaintiff demonstrates that a union officer has benefited personally from an expenditure, the defendant union officer must prove, first, that the funds or property were obtained with the valid authorization of the union after adequate disclosure and, second, that the expenditure was not manifestly unreasonable. If the defendants fail to prove either of these elements, then Section 501 will require the return of the monies or property (or its value) to the union's treasury.

---

1. Section 501 provides as follows:

(a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

## B.

If the diversion of union money or property for the personal benefit of union officers is the primary concern of Section 501, it is not that provision's sole concern. Section 501's fiduciary obligations have been extended to cases involving the handling of union property and funds generally, that is, in cases not involving personal benefits to union officers.[2]

■ Section 501's plain language supports that provision's application to all cases involving union officer's disposition of union property or funds. Nonetheless, absent a showing of personal benefit to the union officer, there is typically little reason to scrutinize his actions. Accordingly, judicial review of that class of union expenditure will be greatly relaxed in deference to the general rule of minimum judicial interference in labor organizations. Indeed, as long as the disbursement has been validly authorized in compliance with the union's constitution, bylaws, and resolutions, a court will typically not have cause to review the reasonableness of the disposition of property or funds.[3]

■ Of course, the prototypical personal benefit requiring heightened judicial scrutiny is cash flowing directly to the union officer from the union treasury: for example, his compensation, or its improper analogue, the conversion of union funds to his own use. We wish to stress, however, that we do not use the term "personal benefit" solely in that narrow sense. By way of example only, we think that a union officer benefits, in a way that justifies heightened judicial scrutiny, (1) from the expenditure of union funds to purchase things for his personal use or for his family and friends, see, e.g., Morrissey, 650 F.2d at 1285 (affirming district court's order for an accounting to determine if foreign travel was for valid business purpose of union); Brink v. DaLesio, 667 F.2d 420, 426 (4th Cir.1981) (officer must pay difference between excessive rent, under lease he negotiated with friend, and reasonable rent for union offices); (2) by the use of union property for personal purposes, see, e.g., Kerr v. Shanks, 466 F.2d 1271, 1277 (9th Cir.1972) (§ 501 violation to use union counsel and funds to defend officers charged with breach of fiduciary duty); or (3) by receiving reimbursement for expenses not related to union business, see, e.g., Morrissey, 650 F.2d at 1279 (affirming order for an accounting to determine if reimbursement for commuting expenses between New York and Florida was for business purpose). We do not think that authorization in cases like these should shield the union officer from liability under Section 501 any more than it should when the union officer receives cash directly from the union treasury.

■ We do not believe, however, that heightened judicial scrutiny is justified any time a union officer receives an indirect benefit from a union expenditure. When a union officer enjoys a legitimate business dinner at union expense, for example, he has been relieved of the personal cost, which he otherwise would have incurred, of daily sustenance and has certainly received, in some sense, a benefit. Obviously, however, courts cannot and should not probe into the reasonableness of every union business dinner. The line should be drawn

---

2. Indeed, some courts have gone even further, extending Section 501's fiduciary duties to all the activities of union officers. *See e.g., Pignotti v. Local No. 3, Sheet Metal Workers' International Association,* 477 F.2d 825 (8th Cir.), *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973); *Sabolsky v. Budzanoski,* 457 F.2d 1245 (3d Cir.), *cert. denied,* 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972).

As in *Vincent v. International Brotherhood of Electrical Workers,* 622 F.2d 140 (5th Cir.1980), we need not decide here the propriety of this extension of Section 501.

3. We should not be understood to hold that the slightest flaw in the authorization will *create* liability vis-a-vis the union officer in a case where the union officer does not personally benefit from a disposition of union property or funds. We merely hold that a valid authorization is normally an absolute defense in such a case. Later case law will have to explore what deviation, if any, in union authorization procedures can be countenanced without giving rise to liability on the part of the union officer.

in these cases between expenditures that benefit the union and those that do not. *See Brink v. DaLesio*, 496 F.Supp. 1350, 1357 (D.Md.1980) ("courts and commentators unanimously have maintained that stricter judicial scrutiny is appropriate when the expenditure confers a personal benefit on the union official ... or where it confers no benefit on the union"), *rev'd in part on other grounds*, 667 F.2d 420 (4th Cir.1981). If a union officer receives an indirect benefit from a transaction in which the union also benefits, valid authorization will normally be a complete defense. *See* 496 F.Supp. at 1362–63 (refusing, where it was effectively conceded that officer might reasonably be provided with union automobile, to inquire into authorized decision to buy Cadillac, instead of more modest car). If, on the other hand, a union officer deals with union funds in a manner which produces no benefit for the union, a court should inquire into the reasonableness of the transaction even if the benefit to the officer is indirect or even remote. *See Brink v. DaLesio*, 667 F.2d at 426 (officer who negotiated lease liable for excess rent, over reasonable sum, paid to landlord who gave officer free use of seaside condominium). In short, the personal benefit test that we adopt today should not be read to exempt from scrutiny authorized expenditures that benefit a union officer only indirectly yet bestow no benefit on the union.

## II.

We proceed to apply the above principles to the specific allegations in this case.

## A.

 The appellants first maintain that Young received reimbursement of approximately $19,000 in expenses without following the procedure outlined in Local 106's bylaws. Specifically, they allege that, first, the Local's Executive Board did not investigate these expenses prior to payment, and, second, the authorization of the general membership was obtained after the fact and is therefore ineffective. The district court found that the appellants had failed to show that these funds resulted in a personal benefit to Young as the term is used in connection with Section 501. It is true that these expenses include a large amount of entertainment and food costs and that Young benefited in the sense that he obtained many free meals and other entertainment. The district court found, however, that the expenditures were accounted for and that they bestowed a benefit on the union. Since the benefit to Young was an indirect byproduct of the public relations aspect of his job, and the primary purpose of the expenditures was to advance the position of the Local and its members, we need not consider the reasonableness of the expenditures provided they have been validly authorized.

We therefore turn to the issue of authorization. As the appellants point out, the Local's bylaws provide that:

> Before any monies, other than regular monthly or weekly charges, are spent by Local Union No. 106, it must first go before the Executive Board for investigation.

Appellant Craiger himself testified that the distinction between regular charges and others is a matter of "prudence" Tr. at 385. Moreover, the trial court found that these expenses were not excessive over a four-year period. Mindful that union officers are given broad authority to interpret the union's constitution, bylaws and other governing documents, we believe that the union was within its discretion in not requiring Executive Board investigation of these expenses prior to payment.

██ Similarly, the appellants' objection to the after-the-fact approval of the reimbursement by the general membership lacks merit. That objection is apparently based on the assertion that these reimbursements were read at a union meeting in a "laundry list" fashion and that the members therefore did not knowingly and willingly consent to the reimbursement after full disclosure. However, that argument erroneously invokes the standard applicable in personal benefit cases. Where, as here, there is only an indirect personal

benefit to a union officer, and the union itself has benefited, authorization by the union need only be technically correct under the rules of union procedure; we will not inquire into its substance.

### B.

■ The second item involves the Local's reimbursement to Young of $10,-764.19 in expenses incurred in attending meetings, expenses which had previously been reimbursed by the International Union. The appellants prevailed on this point in the court below but were awarded only one-half of the amount claimed.

The trial court awarded only one-half of the amount claimed because it "assumed" that the Local had benefited from Young's attendance at the meetings. True or not, that assumption has no relevance in this situation. Young had already been fully reimbursed by the International for these expenses; the second "reimbursement" therefore resulted in a direct benefit to Young. Accordingly, the heightened level of scrutiny applies, regardless of any incidental benefit to the Local.[4]

Under the heightened level of scrutiny, Young has the burden to show that these expenditures were validly authorized after adequate disclosure. As the court below found that Young had failed to disclose that he had already been reimbursed for the expenses, he plainly cannot meet this burden. Moreover, that material omission negates the authorization *in toto*. The judgment of the district court will therefore be modified to award the appellants the full amount claimed or $10,764.19.

### C.

The appellants next contend that Young received a per diem of fifty dollars while attending these same meetings, in spite of the fact that he was reimbursed for all expenses. We need not consider this point because it is apparent that the trial court simply did not believe that Young received

these monies in addition to reimbursements. The appellants' evidence on this point was inconclusive, and the trial court was certainly justified in not according it any weight. (See Tr. at 267–70).

### D.

■ The appellants next contend that Young violated his fiduciary duty to the Local when, acting in his capacity as President of the Louisiana State Pipe Trades Association, (LSPTA) he effected an increase in the per capita assessment by the LSPTA on the Local. This increase was not obtained in accordance with LSPTA guidelines. The appellants argue that even as president of the LSPTA, he maintained a fiduciary obligation to the Local and that this duty was breached by the improper increasing of the assessment on the Local.

Obviously, Young did not benefit personally from this act; we shall therefore review this act with the lower level of scrutiny. Young had a duty with respect to the appellants (and the Local) to operate within the *Local's* rules on Local matters; he did not owe them a duty with respect to his behavior in his capacity with the LSPTA. Moreover, any liability he may have had to the Local for disbursing the funds for the assessment vanished when those increased payments were authorized by the Local in accordance with its bylaws.

### E.

■ Finally, the appellants contend that Young violated his Section 501 duty by causing his pension benefits, the cost of which the Local incurred, to be moved from the Local 106 pension fund to the Local 798 pension fund. This second fund had better benefits but resulted in a higher cost to the Local.

This action clearly conferred a personal benefit to Young and is therefore subject to greater scrutiny. However, the trial court specifically found that this change had been approved of in advance by the

---

**4.** In any event, it is highly unlikely that a union could ever show a benefit from an expenditure

of this type; that is, a second reimbursement for the same expenses incurred.

membership. The trial court inferred that the membership was aware that this change resulted in increased benefits for Young (Tr. at 308). The court's finding on the question of authorization is not clearly erroneous.

Given that the authorization was valid, we turn to determine if the amounts given were manifestly unreasonable; they clearly were not. Indeed, the trial court found that other members of Local 106 who worked on pipelines belonged to the Local 798 fund. In any event, about $9,000 was involved over a period of several years. That order of increase is hardly manifestly unreasonable, particularly in view of Young's $700 weekly salary.

### III.

For the above reasons, the judgment of the Court below IS AFFIRMED AS MODIFIED.